FIRST MIDWEST BANK OF WAUKEGAN, Special Adm'r of the Estate of Vincent Moore, Deceased, Plaintiff-Appellant, v. JACK DENSON, Defendant-Appellee.

Second District   No. 2—89—1319

Opinion filed November 8, 1990.

David A. Decker, of Decker & Linn, Ltd., of Waukegan, for appellant.

Glen E. Amundsen, Victor J. Piekarski, Michael Resis, and Timothy J. Fagan, all of Querrey & Harrow, Ltd., of Chicago, for appellee.

JUSTICE DUNN delivered the opinion of the court:

Plaintiff, First Midwest Bank of Waukegan, as special administrator of the estate of Vincent Moore, filed a wrongful death action against defendant, Jack Denson. The jury determined that Denson was not liable for Moore's death because Denson was acting in self-defense when he shot Moore. On appeal, plaintiff asserts that the trial court erred by denying its motion for a directed verdict on the issue of defendant's liability and that the jury verdict was against the manifest weight of the evidence. We affirm.

At the time of Vincent Moore's death, defendant owned a building with several apartments at 1041 Glenn Drive in North Chicago. Moore and his younger brother were tenants in a basement apartment in the building from January 1987 until mid-September of that year. They moved out because Denson had served them with a five-day notice for failure to pay rent.

Early in October 1987, Denson went out of town on vacation. He returned later that month and went to the building at 1041 Glenn Drive on the evening of October 27 to inspect a water heater. While there, Denson noticed that the locks to the basement apartment he had rented to the Moores and a studio room in the basement were broken. Denson also found three sets of clothing, two sleeping bags, and two metal bars in the studio room. He left two notes in the basement to warn the apparent intruders. Denson put the clothes in plastic bags and then put the bags in a dumpster behind the building.

The next day Denson returned to the building to perform some repairs. He was wearing a holster which contained a revolver. Lee Terry testified that he played basketball with Vincent Moore and Wade Adams that day. Afterwards, Moore persuaded Adams to drive him over to Denson's apartment building. Adams and Terry waited in

the car while Moore went inside the building.

After a few minutes, Terry joined Moore inside the building. Moore and Denson were arguing because Denson had thrown the clothes away. At this time, Moore and Terry were in the basement while Denson was just inside the front door standing near a staircase which led to the basement. Terry and Moore then walked behind the building and saw Moore's clothes in the dumpster.

Moore and Terry then approached Denson at the front door. To reach the entrance, they had to go up a few stairs. At the top of the staircase, there was a 46-inch landing between the stairs and the front door. Moore and Terry went up the stairs and asked Denson why he had thrown the clothes away. Denson stated in a loud and angry voice that he did not know who owned the clothes at the time he threw them away.

According to Terry, he and Moore then began to walk away. When Terry reached the bottom of the stairs, Denson yelled an obscene phrase. Terry went back up the stairs and asked why Denson had made the remark. Moore walked to a point near the top of the staircase. During this argument, Denson began to talk louder, and Moore put a hand on Terry's left shoulder. Shortly thereafter, Denson drew his gun. Terry and Moore began to run away. Denson fired a shot which struck Moore, who was four to six feet away from Denson at the time. Terry did not see the gun go off. Moore briefly continued running but then collapsed on the front lawn of the building.

Wade Adams testified that he drove Moore over to Denson's apartment building on the date in question. About five minutes after Moore went in the building, Terry went in. A couple of minutes later, Adams saw Moore and Terry walk to the back of the building.

Adams then saw Terry and Moore walk over to the entrance to the building. Moore was behind Terry, who stood partially inside the doorway. Moore was on the top step of the stairway. Adams heard some loud conversation between Terry and the person inside the building. Moore was not taking part in the conversation. After about a minute, Moore told Terry to forget about it, that they should leave and go home. Terry then started to walk down the stairs.

According to Adams, he then heard the person inside the building yell some cuss words at Terry. Terry started back up the steps. Moore again told Terry to just forget about it. At the time, Terry was on the second step from the top, and Moore had one foot on the top step and one on the landing. Adams then saw the barrel of a gun appear from inside the doorway. A shot was fired which struck Moore. Moore ran down the steps but collapsed on the front lawn. Neither Moore nor

Terry ever charged toward the man in the doorway. Adams then ran over to Moore. He saw Denson start to raise the gun up toward them, although Denson did not raise it all the way up.

Jack Denson testified that when Vincent Moore first entered the apartment building on the day of the shooting, he asked about his clothes. Denson thought Moore might have left some clothes in the basement apartment when he moved out. When Denson saw Moore go into the studio room, however, he realized he had thrown Moore's clothes away. Denson told Moore that he had thrown the clothes in the dumpster, and Moore became angry. Denson told Moore that the studio room was not living quarters and told him to leave. Moore stated that he was not going anywhere.

Lee Terry joined Moore in the basement. The two of them walked to the rear of the apartment building. They then walked up the front steps and approached Denson, who was performing repairs on the lock of the front door. Terry asked why Denson had thrown Moore's clothes away. Terry was angry and started to argue with Denson. According to Denson, Terry then removed some keys from the front door lock and threw them inside the foyer after Denson asked him to put them back in the lock. Terry admitted in his testimony that he removed the keys from the lock but stated that he merely handed them to Denson.

Denson testified that he then asked Moore and Terry to leave. Moore either grabbed or pushed Terry's left shoulder and Denson started to close the door. Terry kicked back the door that Denson was trying to close; Terry and Moore then charged at Denson. Denson moved backwards slightly and was only about a foot from the staircase leading to the basement. Denson was unable to escape to his left or right because there was an occupied apartment in one direction and a vacant apartment in the other; additionally, the door Terry kicked out of Denson's hands blocked potential entry into the vacant apartment. Denson fired a shot from his revolver because he was afraid Terry and Moore would knock him down the stairs. At the time he fired the shot, Moore was within two feet of him.

Valerie Evans, Denson's stepdaughter, lived in an apartment at 1041 Glenn Drive at the time of the shooting. Evans and Denson both testified that after the shot was fired, Evans came out of her apartment and asked what had happened. They also testified that Denson told her he was trying to prevent the others from pushing him down the stairs. According to Evans, Denson also stated he was just trying to scare them. Denson denied that he said this. Evans further testified that, after the shooting, she ran over to Moore, who was on the

ground. She heard Moore say he was sorry. Evans stated during her testimony that Moore was a friend of hers.

Rodney Pitts, Denson's stepgrandson, testified that he spoke to Denson after the shooting. Denson told Pitts he did not mean to shoot Moore. Defendant's attorney impeached Denson's trial testimony with his deposition testimony that he did not intend to pull the trigger and that Moore was not angry on the day of the shooting. The evidence showed that Moore was 21 at the time he was killed. Denson was 67 years old at this time, and Terry was in his early twenties. Denson was 6 feet 3 inches tall and weighed 250 pounds; Moore was also 6 feet 3 inches and weighed about 195 pounds; Terry was 5 feet 4 inches and weighed about 180 pounds.

Dr. Larry Blum, a forensic pathologist, testified that he performed an autopsy upon Vincent Moore. Dr. Blum testified that Moore had suffered a gunshot wound in the upper back portion of his left arm. The bullet then exited the arm and entered Moore's chest. It passed through Moore's lungs and the left ventricle and right atrium of his heart. In Blum's opinion, the bullet traveled in a straight line and was not deflected while passing through Moore's body. The trajectory of the bullet was downward. Blum stated that the cause of death was internal hemorrhaging resulting from the bullet wound. Blum also testified that he believed Moore was over two feet away from Denson at the time of the shooting because he found no gunshot residue on Moore's corpse during the autopsy. Blum testified that gunshot residue is generally not found if the victim is standing more than two feet from the gun, although this can vary.

Testimony was presented from various witnesses indicating that both Denson and Moore had reputations as peaceful individuals. At the close of the evidence, plaintiff's motion for a directed verdict on the issue of Denson's liability was denied. The jury determined that Denson was not liable, and, in the response to a special interrogatory, the jury found that, at the time of the shooting, Denson reasonably believed the use of deadly force was necessary to prevent death or great bodily harm to himself.

■ A jury verdict is against the manifest weight of the evidence if the opposite conclusion is clearly evident or the findings of the jury are unreasonable, arbitrary, and not based upon the evidence. (*Netzel v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 808, 812.) The credibility of the witnesses and the weight to be accorded their testimony are matters to be resolved by the jury. (*Netzel*, 181 Ill. App. 3d at 815.) Thus, in determining whether a new trial is warranted on the basis that a jury verdict was against the manifest weight of the evi-

dence, neither the trial court nor a reviewing court should act as a second jury by considering the nuances of the evidence or the credibility and demeanor of the witnesses. 181 Ill. App. 3d at 812-13.

■ Section 7—1 of the Criminal Code of 1961 concerns use of force in defense of person and states as follows:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." (Ill. Rev. Stat. 1989, ch. 38, par. 7—1.)

The following factors will be considered in determining whether an individual acted in self-defense: (1) whether that individual was the aggressor; (2) whether the danger of harm was a present one; (3) whether unlawful force, either criminal or tortious, was threatened; (4) whether the individual actually believed that the danger existed, that his or her use of force was necessary to avoid the danger, and that the type and amount of force used was necessary; and (5) whether the individual's belief in each of the above aspects was reasonable even if mistaken. (*People v. Everette* (September Term 1990), No. 69351, slip op. at 7.) The issue of whether a killing is justified because of self-defense is a factual question to be resolved by the jury. *People v. Jordan* (1960), 18 Ill. 2d 489, 492.

■ Although section 7—1 is a criminal statute and *Everette* and *Jordan* are criminal cases, it is well established that the law of self-defense applies in both criminal and civil cases. In *Ewurs v. Pakenham* (1972), 8 Ill. App. 3d 733, the court quoted that portion of section 7—1 which states that an individual may use force intended to cause death or great bodily harm only if the individual reasonably believes such force is necessary to prevent death or great bodily harm to himself or another and then said this statement of the law applied to civil cases as well. (*Ewurs*, 8 Ill. App. 3d at 736.) In *Winn v. Inman* (1983), 119 Ill. App. 3d 836, the court held that a certain instruction offered by plaintiff concerning the question of self-defense should have been given. (*Winn*, 119 Ill. App. 3d at 841.) The court in *Blackburn v. Johnson* (1989), 187 Ill. App. 3d 557, cited *Winn* and *Ewurs* in support of its conclusion that a jury in a civil case was properly instructed on the question of self-defense. *Blackburn*, 187 Ill. App. 3d at 563-64.

Furthermore, in another civil case, *Schnepf v. Grubb* (1970), 125 Ill. App. 2d 432, the court mentioned section 7—1 and several criminal cases in its discussion of the law of self-defense. (See *Schnepf*, 125 Ill. App. 2d at 435.) Thus, we believe it is clear that criminal cases and statutes pertaining to self-defense are persuasive authority in civil cases in which this affirmative defense is raised.

In *Schnepf*, as in the case at bar, the jury concluded that defendant acted in self-defense when he shot and killed an unarmed man. About a week prior to the shooting, defendant, a 76-year-old police officer, was involved in an altercation with decedent, age 19, and decedent's brother, after he stopped decedent's car. According to defendant's testimony, decedent and his brother were the aggressors. The brother grabbed defendant's billy club and struck him in the face. Decedent pushed and shoved defendant, pushing him into a fence at one point. Defendant suffered a broken nose and other injuries during this altercation. (*Schnepf*, 125 Ill. App. 2d at 435.) Other testimony revealed that decedent had a poor reputation in the community for peacefulness. 125 Ill. App. 2d at 437.

On the evening of the shooting, defendant and two other officers stopped a car containing decedent and two companions. Defendant and his companions left the car and walked toward another officer. Decedent then turned away and started to move quickly toward defendant. Defendant warned decedent three times to stop, but he continued to approach defendant. When decedent moved within six feet, defendant fired the shot which killed him. 125 Ill. App. 2d at 437.

The court in *Schnepf* concluded that the jury verdict was not against the manifest weight of the evidence, determining that the jury could have rationally felt that defendant reasonably believed he had to use potentially lethal force to prevent severe bodily injury to himself. (125 Ill. App. 2d at 438.) The court cited the differences in age and physical strength between defendant and decedent, decedent rapidly approaching defendant for no apparent reason while ignoring warnings to stop, and the prior altercation between the two as factors which could have led defendant to reasonably hold such a belief. 125 Ill. App. 2d at 438.

In the case at bar, as in *Schnepf*, there is a large difference in age between defendant and decedent. Plaintiff emphasizes the fact that Denson was bigger than Moore, ignoring the fact that Terry, who was also quite young, was also rushing toward Denson, according to Denson's testimony. Another similarity is that, according to Denson, Moore and Terry were rushing toward him for no apparent reason, as

decedent was in *Schnepf*.

There had been no prior altercation between Denson and Moore as there had been between defendant and decedent in *Schnepf*. Moore, however, had apparently illegally broken into Denson's building and stayed there, another circumstance which could have supported a belief that Moore posed a threat to him. Additionally, a factor present in this case that was not present in *Schnepf* is that a danger existed that if Terry and Moore had come into contact with Denson, they could have easily knocked him down a flight of stairs.

As we have previously stated, it was the function of the jury to determine the credibility of the witnesses. The jury apparently believed Denson's version of events was more credible than that of Terry or Evans. The jury could have rationally concluded from Denson's testimony and other evidence that Denson reasonably believed lethal force was necessary to prevent Terry and Moore from knocking him down the stairs and causing him serious bodily injury. Therefore, the verdict was not against the manifest weight of the evidence.

Plaintiff also contends it was entitled to a directed verdict at the close of the evidence on the issue of Denson's liability. A motion for a directed verdict will only be granted if all the evidence, when viewed in a light most favorable to the opponent, favors the movant so overwhelmingly that no contrary verdict could stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510; *Netzel v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 808, 817.) Since we have determined that the verdict was not against the manifest weight of the evidence, it is apparent that the *Pedrick* standard cannot be met, and plaintiff was not entitled to a directed verdict. See *Netzel*, 181 Ill. App. 3d at 817.

Accordingly, for the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

REINHARD and WOODWARD, JJ., concur.