THIRD DIVISION
December 5, 2007

1-06-0358

JAVON BOYD.                              )     Appeal from the
                                         )     Circuit Court of
        Plaintiff-Appellant,             )     Cook County.
                                         )
            v.                           )
                                         )
THE CITY OF CHICAGO, a Municipal         )
Corporation, and CITY OF CHICAGO POLICE  )
OFFICER DARRYL L. CARROTHERS, Star       )
No. 19208,                               )     Honorable
                                         )     Richard B. Berland,
        Defendants-Appellees.            )     Judge Presiding.

        PRESIDING JUSTICE QUINN delivered the opinion of the court:

        On November 19, 2000, plaintiff Javon Boyd and defendant

Darryl Carrothers, an off-duty police officer, engaged in an

early morning confrontation, which resulted in Carrothers drawing

his gun and shooting plaintiff.  Subsequently, plaintiff was

arrested and charged with misdemeanor battery.

        After the charge against plaintiff was dropped, he filed

suit against Carrothers and codefendant the City of Chicago

(City) for battery, false arrest, and malicious prosecution.

Following a jury trial, defendants prevailed on all counts.  In

this court, plaintiff contends that the trial court erroneously

precluded a witness's testimony and that the verdict was against

the manifest weight of the evidence.

BACKGROUND

As a result of a November 19, 2000, altercation with Carrothers, plaintiff was arrested and charged with misdemeanor battery. The record indicates that four court dates followed. Carrothers appeared for the first three dates, but failed to appear for the fourth court date. Although the record is devoid of the court order, the parties indicate that the charge against plaintiff was dismissed without prejudice during the fourth court date. Subsequently, plaintiff filed this civil suit against Carrothers and the City for battery, false imprisonment, and malicious prosecution. Carrothers and the City hired separate counsel to represent them in the present action.

The record shows that during discovery, plaintiff filed his answers to the City's first set of interrogatories on March 12, 2003. Therein, his answer to defendants' request for names and contact information for potential witnesses consisted of a list of five names, including Derrick Sullivan. Plaintiff wrote "address unknown" next to each name.

In addition, on July 26, 2005, plaintiff filed his answer to the City's additional interrogatory, which requested:

"Pursuant to Illinois Supreme Court Rule 213,

identify all witnesses who will testify at trial and state the subject of their testimony. If you seek to elicit any testimony from a 'controlled expert witness' or an 'independent expert witness,' please make the relevant disclosures required by the Rule."

-2-

Plaintiff's seven-paragraph answer consisted of six paragraphs in which he listed documents and claimed he would call any persons cited therein.  Plaintiff did not specify any individual.

Although the record is devoid of the transcript, the record indicates that the circuit court warned plaintiff's counsel during a pretrial conference that his answers to the Rule 213 (210 Ill. 2d R. 213) interrogatories, which the City's counsel served upon him, were deficient.  As such, the circuit court provided plaintiff's counsel with three options: (1) the court would bar the plaintiff from calling any witnesses except for plaintiff and Carrothers; (2) plaintiff could take a voluntary nonsuit, or (3) the parties could reach an agreement outside of court.  The record indicates that the parties provided the circuit court with a potential list of witnesses.  Plaintiff's counsel provided a list of four potential witnesses, which did not include Derrick Sullivan.

The record further discloses that the circuit court addressed the potential jurors prior to jury selection.  During that address, the circuit court noted that potential witnesses included "plaintiff Javon Boyd, the defendant Officer Darrell [sic] Carrothers, Detective Maude Noflin, Detective Michael Spaulding, Catrice Graham, Frank Novat, James Lucas, Bruce Dean, Derrick Sullivan, and Roel Calima."  The jury was then selected.

Prior to opening statements, the parties again discussed potential witnesses.  During that discussion, the circuit court clarified that Carrothers' counsel could object to plaintiff's

witnesses.  In response, plaintiff's counsel stated:

> "I'm not contending that.  But if the
> position is going to be that he has a right
> to object to us calling witnesses, we need to
> know that now so that we can decide how to
> prepare what we're going to do.  Because we
> came in here prepared to call the witnesses
> that we had agreed upon with the under --
> [sic] under the impression that Mr. Thompson
> had no standing to object to those witnesses.
>
> Now we find that he does have standing
> that he is -- will be asking for a sidebar.
> And if the Court deems his objection is
> appropriate, it would change the posture of
> our case."

After Carrothers' counsel noted that his Rule 213 objections would pertain to opinion witnesses, the circuit court stated it had barred all opinion testimony.  Carrothers' counsel then asserted that he would not object to any fact witnesses disclosed in the "discovery packet."  The parties thereafter proceeded with opening statements.

Following opening statements, plaintiff testified that on the evening of November 18, 2000, he went to Rodney's Cocktail Lounge (Rodney's), which is located on the corner of 71st Street and Michigan Avenue, to attend the birthday party of his friend Rhonda Williams.  His friend Derrick Sullivan was also in

attendance.

During the party, plaintiff saw Carrothers. About 2:30 a.m. on November 19, 2000, plaintiff left Rodney's with his friends and walked to his car in a parking lot south of 71st Street and east of Michigan Avenue. As plaintiff started to put his key in the car door, he heard commotion behind him. When plaintiff looked, he saw Sullivan on the ground near the median of 71st Street, which was about 10 to 15 feet from Rodney's. Carrothers was on top of Sullivan and was hitting Sullivan in the head with his fists.

Plaintiff began to walk quickly toward the scene to break up the fight. As he moved within a foot of the men, Carrothers stood up. Plaintiff testified that he saw a gun on Carrothers' person but denied that he saw four or five other men striking Carrothers. Rather, he stated that no one else was around.

Plaintiff described Carrothers' gun as a "[c]hrome or nickel-plated gun." He testified that it looked like Carrothers retrieved the gun from his waist as he got up, but then stated that it looked like it was already in Carrothers' hand as he rose. Plaintiff swung at Carrothers out of self-defense, but was unsure whether he struck him. Plaintiff then turned and started to run toward his car in a diagonal path. As he ran, he heard a gunshot and fell to the ground. Plaintiff stated, "I felt the impact on my -- actually on my leg kind of, and I just fell to the ground." He asserted that he was shot in the right buttocks and that the bullet exited his front right thigh.

After plaintiff fell, he saw Carrothers point the gun at him again. Plaintiff started to roll on the ground across 71st Street. He heard what "seemed like five or six shots." When he got up, he did not see Carrothers or Sullivan. Plaintiff then ran toward a car he saw at the corner of 71st Street and Michigan Avenue. There, he told a man, whom he identified as Kevin, that he had been shot. Kevin drove him to Saint Bernard's Hospital.

At the hospital, a doctor treated plaintiff's wounds and gave him medication. About 30 minutes after plaintiff arrived at the hospital, Chicago police officers questioned him. When plaintiff left the hospital about 7 a.m., the officers escorted him out and drove him to the police station. There, they handcuffed him to a bar on the wall of a room. The officers again questioned plaintiff about the previous night. Subsequently, from 11:30 p.m. until the next morning, plaintiff was held in a jail cell. Following his release, plaintiff was charged with misdemeanor battery.

Plaintiff denied that he had a gun during his interaction with Carrothers. Around July 23, 2001, the charge against plaintiff was dismissed.

On cross-examination by Carrothers' counsel, plaintiff restated that he saw Carrothers in Rodney's prior to the altercation. He saw Carrothers talking to Catrice Graham, whom he knew through the Williams family. Plaintiff denied that he saw Carrothers talking to Graham outside Rodney's when he left the bar. He further denied that he was part of a group that

-6-

circled and struck Carrothers.

On cross-examination by the City's counsel, plaintiff denied that he saw Carrothers display a police badge during the confrontation. He further denied that Carrothers was wearing a police uniform or that any other police officers were in the area. Carrothers never identified himself as a police officer or attempted to arrest plaintiff.

Plaintiff next called Carrothers as an adverse witness. Carrothers testified that as a Chicago police officer, he was always required to carry his badge and gun when he went out in public whether or not he was on duty. On November 18, 2000, he was on furlough and was working as a security guard at the auto pound at 701 North Sacramento Avenue, which the City owned.

Carrothers further testified that he drove to Rodney's after work at the auto pound and entered the bar about 1:30 a.m. He confirmed that he had his badge and gun when he entered the bar. Carrothers stated that he lived about a mile and a half from Rodney's.

Carrothers asserted that he left Rodney's about 3 a.m. after he heard the announcement of "last call." As he left the bar and headed to his car, Carrothers was talking to Graham, whom he met in the bar. He could not remember what he said to her.

Carrothers stated that six men, including plaintiff, then attacked him outside the bar. Carrothers asserted that plaintiff punched him and drew a gun from his pants. In response, as Carrothers lay on the ground about four feet from plaintiff, who

faced him with his gun drawn, he drew his gun from his holster under his sweater and fired at plaintiff.

Carrothers testified that he identified himself as a police officer several times as the group of men attacked him. He then heard a man say, "Kill that mother f-----." Carrothers stated that he and plaintiff ran away from each other as they fired their weapons.

As Carrothers reached 71st Street, he saw two police officers in a parked vehicle. Carrothers entered the police car, but the officers did not pursue plaintiff.

At the police station at 111th Street and Corliss Avenue, Carrothers recounted the events of his confrontation with plaintiff for an assistant State's Attorney (ASA). He signed a complaint against plaintiff as a police officer of the 15th Chicago Police District. The complaint, which was filed with the court on November 20, 2000, alleged that plaintiff violated section 12-3(a)(1) of the Criminal Code of 1961 (720 ILCS 5/12-3(a)(1) (West 2000)) where he "committed the offense of battery in that he, without legal justification, knowingly caused bodily harm to PO Carrothers." In addition, Carrothers appeared in court three times during proceedings against plaintiff. Each time, he wore his police uniform, which he was required to do as a police officer complainant. However, he did not appear the fourth time when the charge against plaintiff was dismissed.

Plaintiff's counsel then questioned Carrothers about his February 13, 2001, signed statement, which he gave to Chicago

police officer James Lucas about the November 19, 2000 incident. Carrothers admitted that he did not state therein that plaintiff fired a gunshot at him during the confrontation. The complaint also did not name plaintiff as one of the persons who had punched Carrothers in the face.

During questioning by the City's counsel, Carrothers admitted Chicago police rules and regulations prohibit an officer from carrying a weapon in certain circumstances. He asserted that he personally purchased the 9-millimeter Smith and Wesson handgun he carried with him.

Carrothers testified that he identified himself as a police officer when several men attacked him, but he never displayed his police badge. He also stated that he only displayed his weapon after plaintiff pulled out his handgun. Carrothers did not arrest any offenders.

Carrothers confirmed that the complaint he signed against plaintiff alleged misdemeanor battery and that battery against a police offer constitutes aggravated battery, a felony. He was never disciplined by the Chicago police department.

During questioning by his counsel, Carrothers testified that on November 19, 2000, his duties for the Chicago police involved investigations of narcotics and gang activities. He denied that he had any contact with his attackers inside Rodney's or that he punched or kicked Sullivan any time on November 19, 2000.

Carrothers asserted that after he reported the attack to police officers, whom he saw a couple of blocks from the

-9-

altercation, he went to the University of Chicago Hospital for treatment. Afterward, he went to the district police station to answer further questions about the attack.

Carrothers further testified that his handgun was department approved. He volunteered his handgun to the on-scene sergeant after the shooting in accordance with police procedure. Carrothers reasserted that he did not display his badge prior to the altercation. Carrothers did not know he had hit plaintiff with a bullet until he arrived at the hospital.

Upon further questioning by plaintiff's counsel, Carrothers stated that he did not know he shot plaintiff in the buttocks. He only learned that after reading a report.

Finally, Carrothers testified that he received notice of the first three hearings with respect to the complaint against plaintiff. He did not receive notice of the fourth date.

Next, the court allowed the City to call a witness during the plaintiff's case-in-chief due to the witness's presence in court. Roel Calima, an intensive care unit nurse at Saint Bernard's Hospital, testified that he was assigned to the emergency room on November 19, 2000. On that date, he treated plaintiff, who had been shot in the right thigh. Plaintiff received a tetanus shot and a prescription for an antibiotic.

During questioning by Carrothers' counsel, Calima reviewed the medical report of plaintiff's care. He testified that plaintiff's friends brought him to the hospital. Plaintiff told him, "I got shot on my right thigh." Calima's report also

stated:

> "And for my assessment, [p]atient presented to ER with gunshot wound on right side. Able to move affected leg. Awake, alert, and oriented. Complained of only slight pain of infected leg. No shortness of breath noted. And clear breath sounds bilaterally."

In response to plaintiff's counsel's questioning, Calima admitted that he was not very familiar with gunshot wounds. He stated plaintiff had a wound on his right thigh and buttocks. Although Calima testified that he observed that the buttocks wound was larger than the front thigh wound, he admitted that he did not record that observation on plaintiff's medical chart.

Plaintiff next sought to call Derrick Sullivan to testify. The City's counsel objected, however, that Sullivan was an undisclosed Rule 213 witness.

The trial court indicated that it had warned plaintiff prior to trial that his answers to defendants' Rule 213 interrogatories were deficient and had informed plaintiff that he had the option to take a voluntary non-suit or to reach an agreement with defendants. According to the court, defendants had indicated that the parties had reached an agreement as to four possible witnesses, which did not include Sullivan. Plaintiff did not object to this representation.

Despite the omission of Sullivan's name from the list, plaintiff's counsel contended that he should be able to call

Sullivan as a witness, because it would not constitute surprise to defendants, which he argued was the purpose of Rule 213. Plaintiff's counsel also argued that the trial court had read Sullivan's name as a witness to be called when addressing the jury. The trial court responded as follows:

"And we went through that list. I'm not going to repeat myself. I already told you. I've already gone through and we did that before we even commenced jury selection. So I admonished you that your 213 answers left a lot to be desired; that you had a right to take a voluntary nonsuit, if you chose to, at that time.

And maybe you would be -- maybe, or you might be allowed to name other witnesses at a future time if you did that. I encouraged you to try to reach an agreement as to who would be called during the trial. I understood that you had reached an agreement as to who would be called. And counsel for the City and for Mr. Carrothers have both indicated, and you haven't indicated to the contrary, that they never agreed today to Sullivan."

Thus, the trial court barred Sullivan's testimony.

Next, James Lukas, a civilian investigator for the police

department, testified that he interviewed Carrothers on February 13, 2001, and recorded his statement as to the November 19, 2000, incident.  In the statement, Carrothers asserted that Sullivan punched him in the face, knocked him to the ground, and kicked him.  Carrothers made no reference to plaintiff striking him.  Lukas and Carrothers signed the written report.

Plaintiff then retook the stand to show the jury his scars. He referred to the scar on his right thigh as the "big scar."  He also showed the scar on his right buttocks cheek.

Next, Chicago police detective Maude Noflin testified that she and her partner Detective Michael Spaulding investigated the November 19, 2000, incident.  As part of their investigation, they spoke with witnesses, including Carrothers.  Noflin testified that Carrothers had told them that a man with a white shirt had a gun at the scene of the shooting, but Noflin conceded that a white shirt was not recovered from plaintiff at the hospital.  Her testimony also presented that a misdemeanor charge is established where a person is willing to sign a complaint that asserts each element of a misdemeanor crime.

On cross-examination by Carrothers' counsel, Noflin confirmed that she filled out a report of plaintiff's arrest. Therein, Noflin noted that plaintiff stated that he struck Carrothers with his fists and that he was a member of a group of men who attacked Carrothers with their fists and feet.

During further cross-examination by the City's counsel, Noflin confirmed that she and Spaulding arrested plaintiff.  She

stated they had probable cause to make the arrest based on statements by witnesses, including Carrothers and plaintiff.

On redirect examination, Noflin conceded that her case report included a summary of his interview of plaintiff. Therein, plaintiff never stated that he was among the men who attacked Carrothers or that he struck Carrothers with his feet. It only stated that plaintiff struck Carrothers in the head.

Thereafter, plaintiff sought to call Chicago police officer Jacqueline Roberson. Defendants asserted that plaintiff had not previously requested Roberson's appearance. Defendants, however, agreed to attempt to obtain Roberson's appearance in court.

Subsequently, Roberson testified that she saw Carrothers in Rodney's on November 19, 2000, prior to the incident. They each knew the other was a police officer. Upon exiting the bar with others at closing time, she heard two gunshots but did not witness an attack on Carrothers. Carrothers, however, ran up to her and said he had been "jacked." He did not state that a person had pulled a gun on him. Roberson called 9-1-1 to report a shooting.

After plaintiff rested, defendants made a motion for directed verdict. The circuit court denied that motion.

Thereafter, the City called Catrice Graham to testify. She stated that on November 19, 2000, she went to Rodney's to celebrate her cousin's birthday. During the party, Carrothers approached her to engage in conversation, but she declined. Carrothers, who was in street clothes, walked away, but he

-14-

attempted to speak to Graham again when they were leaving the bar. Graham's family members then got into a heated conversation with Carrothers and the verbal dispute evolved into a physical altercation. Graham testified that Carrothers never identified himself as a police officer.

On cross-examination by Carrothers' counsel, Graham confirmed that she was a friend of plaintiff and that plaintiff had suggested a romantic relationship with her in the past. She also confirmed that she saw Sullivan approach Carrothers with his fist clenched and witnessed Carrothers fall to the ground, at which time he appeared to reach for a gun. However, she neither saw plaintiff or Sullivan strike Carrothers nor witnessed any other physical contact. She did hear three to five gunshots. When asked about further details, Graham explained that she ran away from the scene when she saw Sullivan make a fist.

Spaulding testified that he interviewed witnesses following the November 19, 2000, incident. He arrested plaintiff and Sullivan after each admitted hitting Carrothers. Carrothers identified plaintiff as one of the men who struck him.

On cross-examination by plaintiff's counsel, Spaulding reviewed his general progress report (GPR). The GPR disclosed that, during an interview, Carrothers asserted that he identified himself as an officer at the scene of the incident. Carrothers also stated that plaintiff pulled a weapon on him, and he admitted that he fired his weapon. The report indicated, however, that plaintiff denied he had a weapon.

-15-

All parties then rested.  Following closing arguments, the jury returned a verdict for defendants.  Plaintiff now appeals.

ANALYSIS

I. Supreme Court Rule 213(f)(1)

On appeal, plaintiff first contends that the trial court abused its discretion when it barred Sullivan's testimony.  We disagree.

"The exclusion or admission of evidence by the circuit court is reviewed under an abuse of discretion standard and will not be reversed absent an abuse of that discretion." Kim v. Mercedes-Benz, U.S.A., Inc., 353 Ill. App. 3d 444, 452 (2004).  An abuse of discretion occurs only where no reasonable person would take the view adopted by the circuit court.  Kim, 353 Ill. App. 3d at 452.

In the case at bar, the circuit court reprimanded plaintiff before the start of trial that his answers to defendants' Rule 213 interrogatories were deficient.  The court informed plaintiff that he could take a voluntary nonsuit or reach an agreement with defendants.  Thereafter, plaintiff and the City reached an agreement as to four witnesses that plaintiff would call at trial.  That list did not include Sullivan.  The record shows that Carrothers' counsel also agreed he would not challenge any agreement plaintiff and the City reached.

In this court, plaintiff now contends that despite the pretrial agreement encompassing calling four witnesses, which did

-16-

not include Sullivan, the circuit court abused its discretion by barring Sullivan's testimony. In its brief, the City initially asserts that plaintiff never challenged the validity of its pretrial agreement as to the list of four witnesses and, thus, plaintiff has waived any argument regarding Sullivan's testimony. Whether or not the plaintiff waived this issue, we find no error with the circuit court's decision.

As plaintiff's own counsel recognized in contesting Carrothers' initial preservation of his right to contest plaintiff's and the City's agreement as to the list of four witnesses, the purpose of disclosure is to allow the other party to determine how to proceed. Such decisions include whether to depose a disclosed witness. Here, plaintiff failed to disclose any witnesses in accordance with Rule 213(f)(1). Despite such failure, the circuit court allowed the parties to reach an agreement as to which witnesses plaintiff would call. In addition, the record discloses the circuit court's flexibility in allowing plaintiff to call Roberson, who defendants indicated had not been previously requested. Given this record, we conclude that the circuit court clearly did not abuse its discretion in barring the testimony of Sullivan.

Plaintiff's brief mischaracterizes the circuit court's decision to bar Sullivan's testimony as a discovery sanction. Nonetheless, as the City and Carrothers contend, plaintiff would lose under the sanction analysis as well.

Whether a party violated a discovery rule is an issue of law

-17-

that we review *de novo*.  Dalan/Jupiter, Inc. v. Draper & Kramer, Inc., 372 Ill. App. 3d 362, 369-70 (2007), citing People v. Hood, 213 Ill. 2d 244, 256 (2004).  Supreme Court Rule 213(f)(1) provides:

> "Upon written interrogatory, a party must furnish the identities and addresses of witnesses who will testify at trial and must provide the following information:
>
> (1) *Lay Witnesses.* A "lay witness" is a person giving only fact or lay opinion testimony.  For each lay witness, the party must identify the subjects on which the witness will testify.  An answer is sufficient if it gives reasonable notice of the testimony, taking into account the limitations on the party's knowledge of the facts known by and opinions held by the witness."  210 Ill. 2d R. 213(f)(1).

As discussed above, plaintiff clearly violated Rule 213(f)(1) by failing to name witnesses, much less provide witnesses' contact information and the subject of their testimony.

That said, the imposition of a sanction for the violation of a discovery rule, provided by Supreme Court Rule 219(c) (166 Ill. 2d R. 219(c)), falls within the discretion of the circuit court. A sanction will not be reversed absent an abuse of that discretion. Nedzvekas v. Fung, 374 Ill. App. 3d 618, 620-21, 872

-18-

N.E.2d 431, 434 (2007). The factors that the circuit court must consider when imposing sanctions include: "(1) the surprise to the adverse party; (2) the prejudicial effect of the witness' testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timeliness of the objection; and (6) the good faith of the party seeking to offer the testimony." Nedzvekas, 374 Ill. App. 3d at 621, 872 N.E.2d at 435. No single factor is determinative, and each case presents a unique factual situation that the court must consider. Nedzvekas, 374 Ill. App. 3d at 621, 872 N.E.2d at 435.

Here, the parties' briefs focus primarily on the surprise element of Sullivan's testimony. Plaintiff, in particular, argues that defendants would not have been surprised by Sullivan's testimony because eyewitnesses had placed Sullivan at the scene and Sullivan had even pled guilty to battering Carrothers. The City responds that it did not depose Sullivan as a result of plaintiff's failure to name Sullivan pursuant to Supreme Court Rule 213. Further, we find that plaintiff's attempt to call Sullivan as a witness, despite a deficient answer to Supreme Court Rule 213 interrogatories and pretrial agreement, would have raised issues as to plaintiff's diligence and his good faith. Even when the trial court allowed the parties to agree to witnesses to be called by plaintiff, plaintiff did not disclose Sullivan. In addition, Sullivan's testimony would have been cumulative in nature. Given these factors, we conclude that the circuit court would not have erred had it barred Sullivan's

-19-

testimony under its Rule 219 authority.

## II. Manifest Weight of the Evidence

Plaintiff next contends that the verdict in this case was against the manifest weight of the evidence. He argues that the evidence established his claims of battery, false arrest, and malicious prosecution. As the City asserts, however, the record does not contain plaintiff's posttrial motion to vacate the jury's verdict. Rather, plaintiff simply attached that motion to his brief, which was not appropriate. In re Parentage of Melton, 321 Ill. App. 3d 823, 826 (2001). Moreover, that motion did not include this issue, and thus the issue is waived. People v. Enoch, 122 Ill. 2d 176, 186 (1988).

Even if we reviewed this issue, plaintiff's arguments would fail. A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident from the evidence or where the jury's findings are unreasonable or arbitrary and not based on the evidence. Maple v. Gustafson, 151 Ill. 2d 445, 454 (1992). A reviewing court gives great deference to a jury's findings, including the weight of witness testimony and other evidence. Wildman, Harrold, Allen & Dixon v. Gaylord, 317 Ill App. 3d 590, 599 (2000).

### A. *Battery*

We first address plaintiff's claim of battery. The tort of battery is defined as the unauthorized touching of another's person. Welton v. Ambrose, 351 Ill. App. 3d 627, 636 (2004), citing Curtis v. Jaskey, 326 Ill. App. 3d 90, 93 (2001).

-20-

However, as Carrothers argues, Illinois recognizes self-defense as an affirmative defense to such a claim in civil cases. Thompson v. Petit, 294 Ill App. 3d 1029, 1035 (1998). The factors to consider in determining whether a person acted in self-defense are: (1) whether the individual was the aggressor; (2) whether the danger of harm was present; (3) whether unlawful force, either criminal or tortious, was threatened; (4) whether the individual actually believed danger existed, his use of force was necessary to avoid harm, and that the amount of force he used was necessary; and (5) whether the individual's use of force was reasonable even if mistaken. First Midwest Bank of Waukegan v. Denson, 205 Ill. App. 3d 124, 129 (1990).

Here, Carrothers testified that he was attacked by a group of men outside Rodney's as he was speaking to Graham. He asserted that the attack was unprovoked and continued even after he identified himself as a police officer. Further, he stated that he saw plaintiff draw a gun. In response, Carrothers drew his gun and fired at plaintiff. This testimony set forth each factor of self-defense as provided in Denson. In addition, Detectives Noflin and Spaulding provided testimony that supported Carrothers' testimony about the altercation.

Although plaintiff's testimony contradicted Carrothers' version of events, the jury evidently found Carrothers' testimony more credible. Since the jury, as the trier of fact, stood in the best position to ascertain the witnesses' credibility, we find there is no reason to disturb the jury's verdict for

Carrothers.

B.    *False Arrest*

We next address plaintiff's claim of false arrest.  To establish a claim of false arrest, plaintiff had to show that he was restrained by the defendant and that the defendant acted without probable cause.  Reynolds v. Menard, Inc., 365 Ill. App. 3d 812, 819 (2006).

In the case at bar, Carrothers did not arrest plaintiff. However, plaintiff contends that Carrothers was liable due to his filing a complaint against plaintiff.  We recognize that Illinois courts have held that a plaintiff can recover against a private defendant for false arrest where the defendant directed the officers to make the arrest or the defendant's complaint was the sole basis for the arrest.  Randall v. Lemke, 311 Ill. App. 3d 848, 852 (2000).  Although Carrothers was a police officer, we find the Randall analysis persuasive in the case at bar.

Plaintiff argues that Carrothers was liable for his false arrest because Carrothers' complaint was the sole source of information provided to procure his arrest.  The record, however, refutes plaintiff's claim.  Rather, the record shows that Detectives Noflin and Spaulding, the arresting officers, did not arrest plaintiff until after they spoke with witnesses including Carrothers and plaintiff, who the detectives asserted admitted to striking Carrothers.  Given that the record neither shows Carrothers directed the officers to arrest plaintiff nor demonstrates that Carrothers' complaint was the sole basis for

-22-

plaintiff's arrest, plaintiff cannot sustain a claim of false arrest.  Randall, 311 Ill. App. 3d at 852.

We thus find that the jury did not err in ruling for Carrothers on the claim of false arrest.

### 3.   *Malicious Prosecution*

Finally, we address plaintiff's claim of malicious prosecution.  "Illinois does not favor suits for malicious prosecution due to the public policy interest in the exposure of crime."  Ross v. Mauro Chevrolet, 369 Ill. App. 3d 794, 801 (2006), citing Reynolds, 365 Ill. App. 3d at 819.  That said, to establish a claim of malicious prosecution, plaintiff had to show (1) the commencement or continuation of an original criminal or civil proceeding by defendants, (2) termination of the proceeding in favor of plaintiff, (3) the absence of probable cause for the proceeding, (4) the presence of malice on defendants' part, and (5) damages resulting to plaintiff.  Reynolds, 365 Ill. App. 3d at 818-19.  The absence of any one of these elements bars plaintiff's claim.  Swick v. Liautaud, 169 Ill. 2d 504, 512 (1996).

We first note that the record is devoid of a circuit court order disposing of the criminal proceedings.  Plaintiff argues that the circuit court dismissed the case and thus terminated the criminal proceedings in his favor.  Defendants counter that the court's action did not constitute a judgment in plaintiff's favor.  The City further contends that the charge was not dismissed but, rather, characterizes the court's action as

striking the case with leave to reinstate.

Our research has not unearthed a malicious prosecution case that stems from the dismissal of an underlying criminal case or where an underlying criminal case was stricken with leave to reinstate. However, we find that the supreme court's ruling in Swick provides guidance.

In Swick, our supreme court analyzed whether the State's decision to nol-pros a criminal charge against the plaintiff in the underlying criminal case constituted a favorable termination in order for plaintiff to establish a claim of malicious prosecution. The supreme court noted that in a civil malicious prosecution context, "the majority rule is that a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused." Swick, 169 Ill. 2d at 513, citing Restatement (Second) of Torts §§659, 660, 661 (1977). The court explained:

> "The abandonment of the proceedings is not
> indicative of the innocence of the accused
> when the *nolle prosequi* is the result of an
> agreement or compromise with the accused,
> misconduct on the part of the accused for the
> purpose of preventing trial, mercy requested
> or accepted by the accused, the institution
> of new criminal proceedings, or

-24-

impracticability of bringing the accused to trial." <u>Swick</u>, 169 Ill. 2d at 513, citing Restatement (Second) of Torts §§660, 661 (1977).

Our supreme court adopted the majority rule, but also stated that the plaintiff bore the burden of demonstrating that the termination of proceedings was favorable for him. <u>Swick</u>, 169 Ill. 2d at 513. The court then asserted that the plaintiff in that case failed to provide any evidence that the State's decision to nol-pros the criminal charge resulted in a favorable termination for him. <u>Swick</u>, 169 Ill. 2d at 514. As such, the supreme court reversed the jury's verdict for the plaintiff and remanded the case for a new trial on the malicious prosecution count. <u>Swick</u>, 169 Ill. 2d at 514.

Here, despite the lack of clarity regarding the exact characterization of the circuit court's order terminating the criminal proceedings, we observe that the criminal proceedings ceased when Carrothers failed to appear for the fourth court date. Neither this fact nor any other evidence in the record supports an inference that the dismissal of the criminal case was the result of any of the exceptions set forth in <u>Swick</u>. Consequently, we find that plaintiff's argument that he met his burden as to the second element of his malicious prosecution claim arguably has merit.

Nonetheless, the record reveals strong evidence that probable cause for the prosecution was present. As stated above,

the detectives in the case at bar interviewed witnesses, including Carrothers and plaintiff.  The detectives further asserted that plaintiff admitted to striking Carrothers.  Given this record a rational jury could have found that plaintiff failed to prove that probable cause did not exist to prosecute plaintiff.  Thus, the jury did not err in delivering a verdict for Carrothers on the claim of malicious prosecution.

Finally, since plaintiff's claims against the City were predicated on Carrothers' employment as a Chicago police officer, and we have concluded that the jury's verdicts for Carrothers were correct, we find that the jury did not err in ruling for the City.

CONCLUSION

For these reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

GREIMAN and THEIS, JJ., concur.