FOURTH DIVISION
March 9, 2006

No. 1-05-0176

| | | |
|---|---|---|
| WILLIAM REYNOLDS and ELIZABETH REYNOLDS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees, | ) ) | No. 02L5511 |
| v. | ) ) | The Honorable |
| MENARD, INC., | ) ) | William Taylor, Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE GREIMAN delivered the opinion of the court:

After they were found not guilty on charges of retail theft, plaintiffs William (William) and Elizabeth (Elizabeth) Reynolds (collectively, plaintiffs) brought this action against defendant Menard, Inc., alleging that defendant was liable for false imprisonment and malicious prosecution. A jury found for defendant and against plaintiffs on both counts and further indicated, by special interrogatories, that it found that defendant did not act with malice or without probable cause.

On plaintiffs' motion, the trial judge, thereafter, entered judgment in favor of plaintiffs notwithstanding the jury's verdict. Following a damages hearing, a different jury found that each plaintiff had sustained $76,000 worth of damages. The trial court entered judgment on the jury's verdict as to damages. On appeal, defendant contends that the trial court applied the incorrect standard in entering judgment notwithstanding the verdict and, alternatively, that the trial court erred in entering judgment notwithstanding the verdict when sufficient evidence existed to support the jury's findings.

During the liability phase of the bifurcated trial, William and his wife, Elizabeth, both

septuagenarians, testified that on June 14, 2001, they went to defendant's Skokie, Illinois, store to buy supplies for various home improvement projects. Plaintiffs shopped for an hour and a half, selecting, among other items, a faucet for their basement bathroom that cost $149 and a drill for their grandson for Father's Day that cost $289. Elizabeth placed the faucet, drill and several other items in a standard shopping cart, while William transported about 50 pieces of lumber in a flat bed cart. When plaintiffs were finished shopping, Elizabeth proceeded through the checkout line in front of William. Because Elizabeth was pushing many heavy items in her cart, the cashier indicated that she did not have to take them out of the cart. Instead, the cashier came up to the cart and scanned the items. Elizabeth then moved out of the checkout line and waited near the exit door to the store while the cashier scanned William's lumber. Plaintiffs were charged a total of $269.95 for their purchases. William paid for the purchases with two store credit slips totaling $135.35. William called his wife back to the checkout line to hand him a check which he wrote in the sum of $134.60, the remainder of the charge. Penny Tsilipetros, the head cashier, approved the check and one of defendant's employees helped plaintiffs to their car.

Upon arriving home, William sought to install the faucet to the basement bathroom and realized that it did not fit. At the same time, Elizabeth telephoned plaintiffs' grandson Ronald Henderson, who indicated that he already had several drills and had no use for the drill plaintiffs had purchased for him. Accordingly, plaintiffs decided to return to defendant's store to return the faucet and the drill.

Back at defendant's store later on the evening of June 14, 2001, plaintiffs brought the faucet and the drill to the service desk. William then proceeded to shop for more items while

1-05-0176

Elizabeth handled the return with the woman behind the service desk and the front-end manager of the store, Jeffery Hodge. Elizabeth gave Hodge the receipt from plaintiffs' purchase earlier that day. Hodge accepted the returned merchandise and gave Elizabeth a merchandise credit slip in the amount of $475.23, the value of the returned merchandise, plus tax. Plaintiffs bought a few items, including a different faucet which cost $23.99 not including taxes, with the credit slip. The total charge for that purchase was $94.68. Accordingly, when they left defendant's store, $380.55 remained on plaintiffs' credit slip.

The following evening, plaintiffs returned to defendant's store to do more shopping. After selecting several items to purchase, Elizabeth proceeded to the front of the store and waited while William checked out. After scanning plaintiffs' purchases, the cashier informed William that there was no credit on the credit slip plaintiffs had received the evening before. Plaintiffs were instructed to stand near the store entrance while the issue of the credit slip was resolved. During the approximately 15 minutes that plaintiffs were waiting, Elizabeth, whose back hurt, attempted to leave the store to wait in the car. When she left the store, Tsilipetros ran after Elizabeth and told her that she would have to wait inside of the store. Tsilipetros then retrieved a chair for Elizabeth to sit in while she waited. Eventually, plaintiffs were approached by assistant store manager Jeffery DeLong and two police officers who instructed plaintiffs to go into a small security room at the front of the store. Once they entered the security room, DeLong told plaintiffs that they were going to jail for retail theft and instructed them to sign trespass notice forms. The forms indicated that plaintiffs agreed not to enter any of defendant's stores for a year from the date of signing. The officers then handcuffed plaintiffs and took them to the police

˘3˘

station where they were fingerprinted and photographed. Plaintiffs posted bond and took a taxi back to their car, which was still in the store parking lot. Thereafter, plaintiffs hired an attorney and proceeded to trial where they were found not guilty. They described the experience as "humiliating" and "embarrassing."

Attorney Paul DeLuca represented plaintiffs at their criminal trial. He testified that plaintiffs had been charged with retail theft, a misdemeanor that was punishable by up to one year in prison and a fine of up to $2,500. Prior to their trial, DeLuca testified, plaintiffs were offered several reduced sentences by the State's Attorney in exchange for their guilty plea but they refused to plead guilty.

Henderson testified that on the evening of June 14, 2001, he received a phone call from plaintiffs, his grandparents, telling him that they had bought him a drill. Henderson indicated to plaintiffs that he already had several drills and did not need another.

Hodge testified that as the front-end manager of defendant's Skokie store, he was responsible for the checkout aisles and the service desk. On June 14, 2001, Hodge was called by the service desk to approve plaintiffs' return. Elizabeth showed Hodge the receipt from the purchase she had made earlier that day. Hodge pointed out to Elizabeth that neither the faucet nor the drill she was returning were on the receipt. Elizabeth indicated that she must have left the correct receipt at home. Hodge called Tsilipetros to the service desk. Tsilipetros confirmed that Elizabeth had been in the store earlier that day. Hodge also called his supervisor, Harry, who decided that Elizabeth should be given store credit for the returned merchandise. Accordingly, Elizabeth was issued a $475.23 merchandise credit slip. Hodge testified that no-

receipt returns were a common occurrence at the store and that the returned faucet and drill each bore a red security tag. Such tags are affixed to paid-for items by cashiers.

After issuing the credit slip, Hodge began an investigation into the return which resulted in his discovery of several "red flags." On the store's computer system, Hodge entered Elizabeth's information and learned that she was already in the system for having returned other items. Hodge also looked up plaintiffs' transaction from earlier on June 14, 2001. He discovered that the total cost of their purchase was $269.95 and that the purchase was paid for with store credit and a check. Neither the returned faucet, which cost $149, nor the drill, which cost $289, had been paid for by plaintiffs that day. Had the returned faucet and drill been paid for as part of plaintiffs' June 14, 2001, purchase, plaintiffs would have paid a total of $745.18. Hodge noticed that a portion of the store credit that he had issued plaintiffs that evening had already been spent on a new faucet, costing $23.99, and several other items. The new faucet and other items were inexpensive "low-end" products, while the returned faucet and drill were expensive "high-end" products. The computer system also indicated that none of the particular models of faucet and drill that plaintiffs returned had been purchased on June 14, 2001.

Hodge told Harry about the "red flags" and the two men contacted the store's security department. The security department advised Hodge to stop payment on the credit slip and to contact it if plaintiffs returned to the store.

The next day, Hodge was on duty until the early afternoon. When DeLong arrived for his shift, Hodge informed him of the events of the preceding evening. Hodge and DeLong watched a security surveillance video of plaintiffs' first visit to the store on June 14, 2001. Hodge

described plaintiffs' actions and the video and his perception of those actions. The video showed that Elizabeth approached the cashier first, the cashier scanned the items in Elizabeth's cart and Elizabeth moved her cart out of the way towards the store's exit doors, out of the frame of the video. Hodge testified that the faucet and drill were visible and in plain view in Elizabeth's cart but that he could not tell if the cashier scanned the items. Hodge thought it unusual and suspicious that Elizabeth moved her cart so far away from the cashier when her items had not yet been paid for and that she left her cart unattended when she returned to the cashier's area to hand William a check.

Hodge prepared an incident report which suggested that Elizabeth had deceived the cashier and had committed retail theft.

DeLong testified that, though he was not working on the evening of June 14, 2001, when he arrived at work on June 15, 2001, he was apprised of the events of the preceding night. DeLong reviewed the previous day's transactions, noting that the system indicated that no faucet or drill of the particular model returned by plaintiffs had been sold that day and that plaintiffs' receipt indicated that they had not purchased the faucet or drill. DeLong also viewed the video from the day before and, like Hodge, perceived Elizabeth's actions to be suspicious. DeLong signed criminal complaints alleging retail theft against plaintiffs. On June 15, 2001, when DeLong was notified that plaintiffs had returned to the store and were attempting to use the credit slip, he contacted the police. Several minutes later, DeLong and two police officers directed plaintiffs to the security room. DeLong asked plaintiffs to sign trespass notices and "probably" explained that signing the notices meant that they could not enter any of defendant's

stores for a year.

Finally, Tsilipetros testified that as the head cashier she would stand near the entrance to the store, near the checkout aisles, and was responsible for approving personal checks. On June 14, 2001, Tsilipetros saw plaintiffs approach a checkout aisle but did not see what was in their cart. She approved plaintiffs' check. Later that evening, Tsilipetros saw Elizabeth at the service desk. Tsilipetros testified that she did not work on June 15, 2001.

Following deliberation, the jury found for defendant on the claims of malicious prosecution and false imprisonment. By special interrogatory, the jury indicated that it found that defendant did not act with actual malice and that defendant did not act without probable cause.

Plaintiffs orally moved for judgment notwithstanding the verdict, arguing that "the jury's verdict is against the manifest weight of the evidence." The trial court granted the motion, finding "that, even in the best light favorable, that I cannot see how the Jury reached this verdict."

Defendant filed a written motion to reconsider, which the trial court denied, finding "that there is no way this jury could have found what they found."

The court then held the second phase of the bifurcated trial, which concerned damages, and entered judgment on the jury's verdict for plaintiffs of $76,000 each.

On appeal, defendant first contends that the trial court erred in employing an incorrect standard when it found that judgment notwithstanding the verdict was warranted. Defendant notes that in orally moving for judgment notwithstanding the verdict, plaintiffs indicated their

belief that the jury's finding was "against the manifest weight of the evidence." Defendant correctly points out that, while a verdict that is against the manifest weight of the evidence is grounds for a new trial (Maple v. Gustafson, 151 Ill. 2d 445, 454 (1992)), in order to enter judgment notwithstanding the verdict, a trial court must find that " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand' " (Maple, 151 Ill. 2d at 453, quoting Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510 (1967)).

In this case, despite plaintiffs' stated belief that the verdict was against the manifest weight of the evidence, the court specifically stated that it found that, even when the evidence was considered in the light most favorable to defendant, the evidence could not support the jury's verdict for defendant. Accordingly, we find that the trial court considered and expressed the correct standard for a motion for judgment notwithstanding the verdict. Nonetheless, as discussed below, the trial court's determination that the standard had been met, and that judgment notwithstanding the verdict was warranted, was erroneous.

Defendant next contends that the trial court erred in entering judgment notwithstanding the verdict for plaintiffs when the evidence presented at trial supported the jury's findings that defendant did not act without probable cause, a necessary element of a malicious prosecution claim and a false imprisonment claim, and did not act with malice, a necessary element of a malicious prosecution claim.

Again, we note that judgment notwithstanding the verdict is warranted only where the evidence, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors

1-05-0176

the movant that no contrary verdict could possibly stand. Kamp v. Preis, 332 Ill. App. 3d 1115, 1120 (2002). In entertaining a motion for judgment notwithstanding the verdict, a trial court may not reweigh the evidence or set aside the verdict merely because the jury could have drawn different conclusions from the evidence or because, in the court's opinion, a different result would have been more reasonable. Kamp, 332 Ill. App. 3d at 1120. "A judgment notwithstanding the verdict is inappropriate in situations where ' "reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented." ' [Citations.] " Kamp, 332 Ill. App. 3d at 1120. We review a trial court's determination of a motion for judgment notwithstanding the verdict *de novo*. Kamp, 332 Ill. App. 3d at 1120.

A claim for malicious prosecution requires a showing of the following elements: "(1) the commencement or continuation of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice on the part of defendant; and (5) damages resulting to the plaintiff." (Emphasis omitted.) Illinois Nurses Ass'n v. Board of Trustees of the University of Illinois, 318 Ill. App. 3d 519, 533-34 (2000).

"In Illinois, suits for malicious prosecution are not favored. [Citations.] Public policy favors the exposure of crime, and the cooperation of citizens possessing knowledge thereof is essential to effective implementation of that policy. [Citation.] Persons acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them

1-05-0176

by the fear of unfounded suits by those accused." Rodgers v. Peoples Gas, Light

& Coke Co., 315 Ill. App. 3d 340, 345-46 (2000).

A claim for false imprisonment requires a showing that "the plaintiff was restrained or

arrested by the defendant, and that the defendant acted without having reasonable grounds to

believe that an offense was committed by the plaintiff." Meerbrey v. Marshall Field & Co., 139

Ill. 2d 455, 474 (1990). Put another way, to succeed on a claim for false imprisonment, a

plaintiff must show that he was restrained unreasonably or without probable cause. Martel

Enterprises v. City of Chicago, 223 Ill. App. 3d 1028, 1034 (1991).

On appeal, defendant does not contest the trial court's conclusion that plaintiffs proved

that defendant commenced criminal actions against them, that the criminal action terminated in

plaintiffs' favor, that plaintiffs sustained damages or that plaintiffs were restrained by defendant.

Accordingly, we need not discuss these elements.

In arguing that the evidence did not so overwhelmingly favor plaintiffs that it could not

support a finding by the jury that defendant acted with probable cause, defendant primarily

emphasizes the "red flags" raised by the computer system. Specifically, defendant points to the

fact that the receipt plaintiffs presented upon return of the drill and faucet did not indicate that

the items had been paid for as part of the June 14, 2001, transaction, and the facts, brought to

defendant's attention by the computer system, that plaintiffs were charged a total of $269.95 for

all of the items they bought on June 14, 2001, but that for the return of only two items, which

were supposedly part of the June 14, 2001, transaction, they were issued a credit of $475.23, that

plaintiffs had previously made returns to defendant's store, that on June 14, 2001, no drill or

1-05-0176

faucet of the make returned by plaintiffs had been sold, and that the drill and faucet returned by plaintiffs were high-end products, while the other purchases made by plaintiffs, in particular a replacement faucet, tended to be less expensive.

On the contrary, in arguing that the trial court correctly found that the evidence so overwhelmingly favored plaintiffs that the jury's finding regarding probable cause could not stand, plaintiffs point to the fact that their outward behavior was not suspicious. Specifically, plaintiffs emphasize the facts that they are a married couple in their seventies, that they shopped for over an hour and a half on June 14, 2001, before checking out, that the faucet and drill bore red security stickers, indicating that they had been paid for, that they asked for help to their car and that the faucet and drill were in plain view during checkout, as evidenced by the surveillance

1-05-0176

video.[1]

Thus, the issue, as we see it, is whether the information provided by defendant's computer system could have given rise to probable cause to believe that plaintiffs were guilty of retail theft in the absence of outwardly suspicious behavior by plaintiffs.

Probable cause is defined as " 'a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged.' " Johnson v. Target Stores, Inc., 341 Ill. App. 3d 56, 72 (2003), quoting Rodgers, 315 Ill. App. 3d at 348. The state of mind of the one commencing the prosecution, rather than the actual facts of the case, the guilt or innocence of the accused, is at issue. Johnson, 341 Ill. App. 3d at 72. "[A] mistake or error that is not grossly negligent will not

---

[1]Because defendant has not provided this court with a copy of the surveillance videos taken on June 14 and 15, 2001, we must assume that the videos support the court's entry of judgment notwithstanding the verdict. See Foutch v. O'Bryant, 99 Ill. 2d 389, 391-92 (1984).

affect the question of probable cause in an action for malicious prosecution when there is an honest belief by the complainant that the accused is probably guilty of the offense." Johnson, 341 Ill. App. 3d at 72.

Of particular importance to the issue raised here, is the long-standing rule:

"A reasonable ground for belief of the guilt of an accused may be on information from other persons as well as on personal knowledge. [Citations.] It is not necessary to verify the correctness of each item of information so obtained; it is sufficient to act with reasonable prudence and caution in so proceeding." Turner v. City of Chicago, 91 Ill. App. 3d 931, 935 (1980).

While this rule has not explicitly been extended to stand for the proposition that a reasonable ground for belief of guilt may be based on information not only from other *persons*, but also from other sources, such as store records that are kept on store computer systems, it is important to note that courts in this state as well as courts of other jurisdictions have consistently allowed a finding of probable cause based, at least in part, on information gleaned from computer systems and store records. See Johnson, 341 Ill. App. 3d 56 (finding that store was not liable for malicious prosecution of its employee; store security personnel had probable cause to believe employee had committed retail theft based, in part, on their observation of register activity, via computer, that showed that cashier repeatedly overrode prices of items employee was purchasing and hand-keyed lower prices); Burghardt v. Remiyac, 207 Ill. App. 3d 402 (1991) (summary judgment for store on claim of malicious prosecution was proper; store owner had probable cause to believe that employee had falsified refund slips to steal money from store,

based, in part, on a review of 3 1/2 months of refund receipts that showed that employee was only employee on duty when each suspect refund was made); Herrington v. Red Run Corp., 148 Md. App. 357, 811 A.2d 894 (2002) (summary judgment for store on claim of false imprisonment was proper; store manager had probable cause to believe that customers were guilty of theft based on manager's observation of register activity, via computer system, that indicated that customers were undercharged); Rezendes v. Beaudette, 797 A.2d 474 (R.I. 2002) (grant of store's motion for new trial, following jury verdict for employee, on malicious prosecution claim was proper; probable cause to believe that employee had committed larceny based, in part, on computer information that high number of customer credits had been issued through employee's password and that credits did not correspond with late fees, as they would have been expected to); Wal-Mart Stores, Inc. v. Binns, 341 Ark. 157, 15 S.W.3d 320 (2000) (employer entitled to directed verdict on claim of malicious prosecution; probable cause to believe that employee was guilty of theft based on computer information indicating that employee was taking money from cash registers).

Welcome to the 21st century. Recognizing the advances made, we find that probable cause to believe a person is guilty in the context of a malicious prosecution or false imprisonment actions may be based on information from sources other than personal knowledge, including information from other persons as well as from records kept on store computer systems. As evidenced by the testimony presented in this case and by a review of the facts of other cases, modern computer systems allow retailers to track the purchase, return and pricing of their products as well as the transactions performed by their customers. Even absent outwardly

suspicious behavior by a customer, information and records obtained from a computer system may indicate a possibility that a customer is guilty of retail theft. Permitting retailers to rely on such information promotes public policy by exposing crime. Again, welcome to the 21st century.

Turning to the facts of this case, we first note, as plaintiffs point out, that plaintiffs did not act outwardly suspicious during their visits to defendant's store on June 14 and 15, 2001, in that they did not, for example, appear to conceal the faucet or drill or give false information when they returned the faucet or drill. Nonetheless, viewing the facts in the light most favorable to defendant, given the facts that plaintiffs bought only $269.95 worth of merchandise on June 14, 2001, but returned items they claimed to have bought on June 14, worth $475.23, that plaintiffs had a history of making returns to defendant's store, that no drill or faucet of the make returned by plaintiffs was sold on June 14, 2001, and that the returned drill and faucet were expensive items, while plaintiffs generally tended to buy inexpensive items, we cannot say that the evidence so overwhelmingly favored plaintiffs that the jury's finding that defendant had probable cause to believe plaintiffs had committed retail theft cannot stand. Put another way, there was sufficient evidence presented from which the jury could have found for defendant and we must defer to the jury's finding.

Finally, we address the element of malice.

"[Malice] is proved by showing that the prosecutor was actuated by improper motives. [Citation.] *** Malice may be inferred from want of probable cause when the circumstances are inconsistent with good faith by the prosecutor and

where the want of probable cause has been clearly proved.  [Citations.] However, malice may not be inferred where probable cause exists." <u>Turner</u>, 91 Ill. App. 3d at 937.

We have concluded that the jury could have found that defendant proceeded against plaintiffs with probable cause, and therefore malice cannot be inferred.  Moreover, a review of the record does not disclose any evidence that defendant was motivated by improper motives.  Accordingly, we find that the overwhelming weight of the evidence did not preclude the jury's finding that defendant did not act with malice.

For the reasons stated above, we reverse the judgment of the trial court and, on remand, direct the trial court to enter judgment on the jury's verdict finding defendant not liable for malicious prosecution or false imprisonment.

Reversed and remanded.

QUINN, P.J., and MURPHY, J., concur.