In the

# United States Court of Appeals
### For the Seventh Circuit

No. 09-1180

CARNELITA STOKES and NYOKIA STOKES,

*Plaintiffs-Appellants*,

*v.*

BOARD OF EDUCATION OF THE CITY OF CHICAGO,
a municipal corporation, and JOHNNY BANKS,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CV 493—**Suzanne B. Conlon**, *Judge.*

ARGUED DECEMBER 10, 2009—DECIDED MARCH 19, 2010

Before POSNER, MANION, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* On January 23, 2007,
Principal Johnny Banks encountered what looked like a
fight among several adult women in the office of his
Chicago elementary school. At Principal Banks' request,
the police arrested four women. After criminal charges

were dropped, two of the women sued Principal Banks and the Board of Education of the City of Chicago. Plaintiffs Nyokia and Carnelita Stokes are the mother and grandmother, respectively, of four children who attended the school at the time of the incident. The Stokes brought suit under 42 U.S.C. § 1983 alleging that Banks violated their Fourth Amendment rights by swearing to false complaints of disorderly conduct and causing false arrests. Plaintiffs added state-law claims for false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress. The district court granted summary judgment for the defendants on all claims. Plaintiffs appealed, and we affirm.

I.   *The Facts for Purposes of Summary Judgment*

We review the district court's grant of summary judgment *de novo*, construing all facts and reasonable inferences in the light most favorable to the non-moving parties. *Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009). We will affirm a grant of summary judgment if the evidence establishes that there are no genuine issues of material fact, leaving the moving parties entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Many factual details are disputed in this case, but a factual dispute is material only if its resolution might change the suit's outcome under the governing law. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor

of the non-moving party on the evidence presented. See *id*. In deciding a motion for summary judgment, neither the district court nor this court may assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence. The courts must view all the evidence in the record in the light reasonably most favorable to the non-moving parties. See *id.* at 249-50.

We state the facts in light of the standard for summary judgment and without vouching for the objective truth of this account, especially as it might reflect on those who are not parties to this case. In the weeks before the fight, Nyokia Stokes' third-grade daughter experienced conflict with another girl in her class. The conflict escalated to the parents. The night before the incident that resulted in arrests, the other girl's mother (Ebony Scott) and a male companion went to Nyokia's home and threatened her. The police were called, but they deferred to school authorities. The next morning, January 23, 2007, Nyokia and Carnelita met with the police and Principal Banks at the school. Banks said that he would set up a meeting between the Stokes and Scott.

Around 2:30 p.m. that day, Nyokia and Carnelita returned to the school to pick up Nyokia's daughter in kindergarten and to check on the status of the proposed meeting with Scott. They waited in the school office, which is where kindergarten children are picked up and which is adjacent to Principal Banks' office. While they were waiting, Scott entered with a female companion identified only as "Scott's cousin Pony." Scott

approached Nyokia aggressively and yelled at her for telling Principal Banks about the events of the previous night. Nyokia responded by saying only, "that's not why we're here." Scott and Pony then set upon Nyokia, grabbing her hair and tearing out her artificial braids, causing her to bleed and suffer significant pain and distress. By the time the attack ended, Scott and Pony had pulled approximately eight braids (and the natural hair to which they were attached) from Nyokia's scalp. Nyokia estimated that the attack lasted 20 minutes, though that seems highly improbable under the circumstances. By all later accounts of witnesses, Scott and Pony were the aggressors, and neither Nyokia nor Carnelita retaliated verbally or physically. Carnelita called 911 to summon the police, apparently as the altercation was ending.

During the attack, approximately 30 kindergartners were dismissed from school and entered the office together. They became extremely agitated by the scene they encountered and began to yell. Nyokia testified that they were "hollering for 20 minutes" until Principal Banks arrived. One student was knocked over as a result of the adults' assault.

Principal Banks arrived in the office either as the fight was breaking up or immediately after it had broken up. Nyokia testified that he entered the office "at the last minute" when "everything was over with." Carnelita testified that up until the moment that Banks entered the office, Scott was on the floor with her hands gripping Nyokia's hair. Nyokia was still upright, and Scott was

attempting to pull her to the floor with her. It is unclear exactly how Pony was positioned, but her hands were also in Nyokia's hair. Nyokia was using her hands to try to remove her attackers' hands from her hair. Carnelita further testified that when Principal Banks approached, Scott and Pony let go of Nyokia's hair and backed away.

Nyokia described a noisy, chaotic scene in the office, crowded with adults and children even after her attackers were disentangled from her. Banks testified that he entered the school office from his adjoining office, while others testified that he entered the school office via the hallway. Upon entering, Banks instructed Scott and Pony to go into his office, and he told the Stokes to go to another room down the hall. Carnelita and Nyokia Stokes eventually did so, accompanied by teacher Mylea Fossett.

Fossett and Banks testified that at this stage, Principal Banks was attempting to assess the situation but had difficulty doing so because Carnelita refused to leave the office and yelled at Banks for an extended period of time. Fossett testified that Carnelita remained near Banks and continued yelling while Banks was trying to keep the parties separate and was trying to ask certain individuals, including Nyokia, about the circumstances of the attack. Fossett further testified that Carnelita yelled at Banks when he came to talk to the Stokes while they waited for him in a room down the hall. Both Fossett and Banks testified that Carnelita's behavior interfered with Banks' ability to keep the parties separate and to regain control of the school.

Carnelita's testimony disputes this account, but only to a limited extent. She contends that she said nothing at all to Banks until he came to see them in the nearby room. She did not testify about and has not disputed the defendants' evidence that she was yelling in the moments immediately following the attack, that she did not immediately comply with Banks' request that she go with Nyokia to the room down the hall, and that she was yelling at Banks once he entered that room.

Fossett and the Stokes waited together for Banks in the nearby room. Banks entered with police officers and told them to arrest both Nyokia and Carnelita. According to the Stokes' testimony, the following exchange occurred: The police asked Banks why he wanted them arrested. Banks responded: "First of all, I want her [Carnelita] arrested." When Carnelita asked why, Banks replied: "Because you're not supposed to be here." Nothing in the record indicates that Carnelita had been denied permission to be at the school. Nyokia pleaded with Banks not to have her mother arrested, saying that Carnelita had nothing to do with the altercation. Nyokia told Banks: "Don't lock her up. Take me to jail. Because she's sick, my mom is sick." Banks responded: "I'm going to have to lock both of you up." The police again asked Banks if he was sure about his decision. His reply was affirmative.

Banks and the officers then left the room to complete paperwork. Banks swore out criminal complaints with the police against Ebony Scott, "Pony," and both of the Stokes. The complaint against Carnelita stated that she

"did knowingly and intentionally fight with another person, use loud profane language causing a crowd to gather in such an unreasonable manner as to alarm and disturb the calm of the school and provoke a breach of the peace." The complaint against Nyokia stated that she "did knowingly and intentionally fight with another person and refused to stop [and] used loud profane language causing a crowd of students to gather thereby disturbing the calm of the School thereby provoking a breach of the peace." While it is undisputed that Banks tried to ascertain more information about the incident before he signed the complaints, the court must assume that Banks did not attempt to determine which parties were the aggressors.

Nyokia and Carnelita were escorted into the hallway, where they were arrested and handcuffed within sight of Nyokia's children. Before the police took them away, janitor Michael Bell spoke with Banks and told him that he did not think Nyokia or Carnelita should be arrested. Banks responded, "they can't do this on school property." The Stokes were released late that night, at about 3:00 or 4:00 a.m. The criminal charges against them were dismissed, and Banks later told Carnelita Stokes that he had made a mistake and should have had only the other women arrested.

The district court granted summary judgment on all claims. The court acknowledged the conflicting testimony regarding what Banks actually witnessed, the history of conflict between the Stokes and Scott, and what happened after the women were separated. The court determined

that these factual disputes were immaterial to the central issue: whether Banks had "a reasonable basis to believe the Stokes were involved in disturbing the school and upsetting 30 schoolchildren when he called the police and caused their arrest?" The court granted summary judgment on the Fourth Amendment claims. The court also granted summary judgment on the state-law claims, finding that the plaintiffs "failed to proffer any admissible evidence that Banks' decision to call the police or cause their arrests was maliciously motivated, and not based on probable cause, or that he intentionally inflicted emotional distress." The Stokes appealed.

## II.  *Fourth Amendment False Arrest Claims*

The Stokes argue that genuine issues of material fact barred summary judgment against them on their Fourth Amendment false arrest claims. They assert that Principal Banks did not have probable cause to swear out the criminal complaints against them causing their arrest for the offense of disorderly conduct as defined under Illinois law. See 720 Ill. Comp. Stat. 5/26-1(a)(1).

Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983. *McBride v. Grice,* 576 F.3d 703, 707 (7th Cir. 2009) (affirming summary judgment for defendant police officer). We may reverse the district court's grant of summary judgment only if we find that the Stokes offered sufficient evidence to create a genuine dispute of material fact regarding the existence of probable cause.

Probable cause exists if, at the time of the arrest, the facts and circumstances within the defendant's knowledge "are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *E.g.*, *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) (reversing summary judgment for arresting officer). A court evaluates probable cause not with the benefit of hindsight, and not on the facts as perceived by an omniscient observer, but on the facts as they appeared to a reasonable person in the defendant's position, even if that reasonable belief turned out to be incorrect. *Id.*; *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) (affirming summary judgment for arresting officer).

A police officer's probable cause determination depends on the elements of the applicable criminal statute. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006) (reversing summary judgment for officer who arrested plaintiff for violating Indiana disorderly conduct statute). Illinois law defines disorderly conduct as "knowingly [doing] any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace[.]" 720 Ill. Comp. Stat. 5/26-1(a)(1). The offense is intended to guard against "an invasion of the right of others not to be molested or harassed, either mentally or physically, without justification." *People v. Davis*, 413 N.E.2d 413, 415 (Ill. 1980) (affirming conviction where defendant entered home of elderly invalid and implicitly threatened her with harm if she testified against his brother). Whether conduct is reasonable depends on the facts and circumstances of the case.

*People v. Queen*, 859 N.E.2d 1077, 1085 (Ill. App. 2006) (finding that officer had reasonable grounds to arrest for disorderly conduct, although officer cited a different statute to justify arrest). A person's conduct must actually bring about a breach of the peace, not merely tend to do so. *In re D.W.*, 502 N.E.2d 419, 421 (Ill. App. 1986) (affirming conviction where defendant threatened to beat up classmate at school). The issue here is not whether the Stokes actually committed the crime of disorderly conduct. We must determine only whether the facts taken in the light reasonably most favorable to the Stokes show that a reasonable person in Principal Banks' position could have had probable cause to believe that the Stokes engaged in disorderly conduct. See *Kelley*, 149 F.3d at 646.

To form a belief of probable cause, an arresting officer is not required, and certainly a complaining witness like Principal Banks is not required, to act as a judge or jury to determine whether a person's conduct satisfies all of the essential elements of a particular statute. See *Driebel v. City of Milwaukee*, 298 F.3d 622, 645 (7th Cir. 2002) (affirming summary judgment for arresting officer). Rather, probable cause involves the exercise of judgment, which "turn[s] on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993), quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983). While this determination is often left to the jury, the court may decide whether probable cause existed if the facts material to the probable cause determination are not in dispute. *E.g.*, *Neiman v. Keane*, 232 F.3d 577, 580-81 (7th Cir. 2000) (affirming summary

judgment for officer who had probable cause for arrest for theft of services); *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246-48 (7th Cir. 1994) (affirming summary judgment for officers who had probable cause for arrest for battery and had no duty to conduct further investigation); *Gramenos v. Jewel Cos.*, 797 F.2d 432, 438-42 (7th Cir. 1986) (affirming summary judgment for officers who had probable cause for arrest for shoplifting and had no duty to conduct any investigation).

Even when all genuine factual disputes are resolved in the Stokes' favor, Principal Banks entered the office from the hallway, where he could hear children screaming and unidentified adult female voices shouting obscenities. When Banks entered the office, he found Nyokia, Scott, and Pony still tangled together in a violent exchange. Nyokia was upright and positioned over Scott, who was on the floor. Scott's and Pony's hands were in Nyokia's hair, and she was using her hands to try to fend off her assailants. Nyokia was yelling loudly, in an "hysterical" state. The room was full of many other people, including 30 young kindergarten students, who were also yelling in response to the distressing scene. The chaos was continuing up to the time Banks arrived.

Scott and Pony released their grip on Nyokia once Banks had fully entered the office. However, the accounts of Nyokia and Carnelita do not contradict Banks' assertion that before he fully entered the office, he saw the three women entangled with arms "reaching and swinging and punching." With the benefit of hindsight on summary judgment, we must assume that Nyokia was

an innocent victim of an assault. Nevertheless, the undisputed facts show that a reasonable person in Principal Banks' position at the time could easily have viewed her as an equal participant in the fight. Accordingly, Banks had probable cause to sign a criminal complaint against Nyokia Stokes for disorderly conduct. See *Mustafa v. City of Chicago*, 442 F.3d 544, 547-48 (7th Cir. 2006) (affirming summary judgment for officer who had probable cause to arrest plaintiff for disorderly conduct when he arrived at the scene to find "'commotion' and 'agitation' in progress, with [claimant] at its center, at a crowded ticket counter at an international airport," even though claimant had been acting peaceably); 720 Ill. Comp. Stat. 5/26-1(a)(1).

While plaintiffs emphasize Banks' concession that he did not recall Carnelita Stokes "being involved in the physical," the crime of disorderly conduct does not require an element of physical force. A person engages in disorderly conduct if he or she "knowingly: (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 Ill. Comp. Stat. 5/26-1(a)(1). Banks entered a chaotic elementary school office crowded with young and distressed children. While Carnelita was not physically entangled with the other women, she was very much at the center of the scene. Banks also knew she was the mother of Nyokia, who was in the physical swarm. A reasonable person in his position could have inferred that Carnelita shared some responsibility for the incident. Carnelita's behavior reasonably led Banks to believe that she would continue to be an agitating factor who would limit his ability to

regain peace and order in the school. Both Banks and teacher Fossett testified that Carnelita was yelling constantly after the physical altercation had ended and that she refused to comply with Banks' requests that she leave the area.

While Carnelita denies ever saying anything to Banks, her testimony does not contradict the assertions of Banks and Fossett that she was yelling hysterically after the fight had broken up and that this conduct interfered with Banks' ability to restore order in the school.[1] Carnelita has not testified that she remained calm or quiet or that she immediately complied with Banks' request to go down the hall to separate the adults. Given Carnelita's proximity and her family connection to the brawl, her hysterical yelling after it had ended, and Banks' responsibility to restore order to the school, a reasonable person in Banks' position could have perceived Carnelita as unreasonably alarming or disturbing others and provoking a breach of the peace. Plaintiffs have not met their burden of coming forward with evidence showing that Banks did not have probable cause to believe that Carnelita had engaged in disorderly conduct.

Plaintiffs argue further that Banks failed to investigate the incident. They say that if he had properly gathered

---

[1] Plaintiffs point to the transcript of Carnelita's 911 call as evidence that she was acting calmly. While the 911 transcript suggests that Carnelita remained calm during the call and that Banks was present for part of the call, it does nothing to inform us about her behavior before or after the brief time period covered by the transcript.

more information by questioning witnesses, he would have learned that the Stokes bore no responsibility for the disturbance and did not engage in disorderly conduct. We see no basis for imposing such obligations on a school principal to investigate before asking police officers to take steps to restore order in a public school.[2]

The law gives a police officer latitude to make reasonable judgments in light of the circumstances. While an officer may not close his or her eyes to clearly exculpatory facts, the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation. *McBride v. Grice*, 576 F.3d 703, 707-08 (7th Cir. 2009) (officer had probable cause to arrest both participants in a physical altercation after talking to participants and viewing an inconclusive surveillance video; officer had no duty to interview witnesses or to

---

[2] It is unusual to see a Fourth Amendment false arrest claim against a civilian school principal who did not arrest the plaintiffs himself, though defendants have not tried to portray Principal Banks as a typical civilian witness. Banks was acting under color of state law in his capacity as principal. We have held, by way of comparison, that a police officer may be liable for a constitutional false arrest claim by signing a false criminal complaint that led to the claimant's arrest. *Acevedo v. Canterbury*, 457 F.3d 721, 723 (7th Cir. 2006); *McCullah v. Gadert*, 344 F.3d 655, 660-61 (7th Cir. 2003). Since the police gave Banks the authority to sign a criminal complaint, he could be liable for false arrest if he lacked probable cause to allege the criminal acts detailed in the complaint. See *Acevedo*, 457 F.3d at 723.

examine additional evidence); *Mustafa v. City of Chicago*, 442 F.3d at 548 (affirming summary judgment for officers; police have no duty to investigate extenuating circumstances or to search for exculpatory evidence once they have probable cause to arrest). In some situations, an officer may be required to conduct some investigation before making an arrest; in others, an officer may have probable cause for arrest without any need for investigation. Relevant factors include the information available to the officer, the gravity of the alleged crime, the danger of its imminent repetition, and the amount of time that has passed since the alleged crime. See *Mason v. Godinez*, 47 F.3d 852, 856 (7th Cir. 1995) ("amount of information the police are required to gather before establishing probable cause for an arrest is in inverse proportion to the gravity of the crime and the threat of its imminent repetition"); *BeVier v. Hucal*, 806 F.2d 123, 127 (7th Cir. 1986) (same, finding no probable cause where it was unclear whether a crime had actually occurred, and if it had, there was no threat of its imminent repetition); *Gramenos v. Jewel Cos.*, 797 F.2d 432, 438 (7th Cir. 1986) (finding defendant officers did not need to conduct investigation and stating: "Probable cause can be a matter of degree, varying with both the need for prompt action and the quality of information at hand."); see also *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir. 1994) (explaining that where there is "a lapse of time between the alleged lawbreaking and the arrest, . . . we find it more likely that some type of investigation—for example, the questioning of witnesses—will be appropriate," but finding no need for investigation where the alleged crime had just occurred and the officers arrived to find a chaotic scene).

We apply these factors to a reasonable person in the defendant's position. When considering the amount of information available to Banks, we must recall that he is an elementary school principal, not a police officer. A principal is responsible for maintaining order and protecting the children in his or her charge. The principal is not responsible for performing police investigations and deciding just how to allocate fault for the violent and disruptive actions of adults present in the school. The amount of information that Banks could reasonably be expected to gather was limited.

A full investigation here would have taken a significant amount of time. There were four possible arrestees and dozens of potential witnesses. Many young children were present and were agitated and distressed. Banks' job was to manage the school and to restore the order that the adults had destroyed. He did not have the time or the duty to carry out a police investigation. There is no evidence that Banks ignored information that would have undermined probable cause. While janitor Bell told Banks that he thought the Stokes should not be arrested, he said so after the probable cause determination had been made and with only a one-sentence personal opinion, unaccompanied by any specific facts.

The need for prompt action was high, given the potential for further harm to students and the prospect that the fight could start up again. While disorderly conduct is not usually considered a grave offense, it can be a prelude to serious violence. And it can be a particularly serious matter when the conduct involves violence and

loud profanity in the presence of young children, especially in a school. At least one kindergarten student was knocked down by the brawl. Many others showed they were distressed at the sight of such violence right in front of them at school. The children and their parents had a right to expect the principal and the police to act swiftly to restore order. The situation jeopardized the physical safety of the students, the staff, and the four women involved. It also threatened the psychological well-being of many young children. It was not unreasonable for Banks to act immediately to remove any further threat of physical or psychological harm, and to ask the police to do so without further investigation at the time. If the police had qualms about the arrests, they were capable of investigating further if they thought it necessary. See *BeVier v. Hucal*, 806 F.2d at 128 (affirming judgment for plaintiffs arrested without probable cause for child neglect; it was not witness's duty to supply information relevant to probable cause but was the duty of the "investigating and arresting police officer . . . to extract that information."). The undisputed facts show that Principal Banks had probable cause to sign criminal complaints for disorderly conduct against Nyokia and Carnelita Stokes.

III. *State-Law Claims*

Lack of probable cause is a common element of the Illinois claims of false arrest, false imprisonment, and malicious prosecution. See, respectively, *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 317 (Ill. App. 2006); *Reynolds v. Menard, Inc.*, 850 N.E.2d 831, 837 (Ill. App. 2006); and

*Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 265 (Ill. App. 2002). The fact that Banks had probable cause to sign the criminal complaints for the Stokes' arrest means that defendants are also entitled to summary judgment on these supplemental state-law claims.

To survive summary judgment on the remaining claim for intentional infliction of emotional distress, plaintiffs must present evidence showing that (1) the defendant's conduct was truly extreme and outrageous, (2) the defendant either intended to inflict emotional distress or knew there was at least a high probability that he would cause severe emotional distress, and (3) the conduct in fact caused severe emotional distress. *E.g.*, *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003); *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). The Stokes have offered no evidence supporting the first element, truly extreme and outrageous conduct. To satisfy this element, a defendant's conduct must be "so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier*, 798 N.E.2d at 83. Even when the facts are taken in the light reasonably most favorable to the Stokes, Principal Banks' actions to secure the arrest of plaintiffs based on probable cause, designed to restore order to a public school, did not come close to being "truly extreme and outrageous," even though he was mistaken about these plaintiffs' roles in the disturbance. We affirm summary judgment on the claim for intentional infliction of emotional distress.

The judgment of the district court is AFFIRMED.