NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 13, 2011[*]
Decided April 13, 2011

*Before*

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 10-2783

| | |
|---|---|
| KELLY S. MAHNKE, *Plaintiff-Appellant,* | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 09-cv-408-wmc |
| DANIEL GARRIGAN, *Defendant-Appellee.* | William M. Conley, *Chief Judge.* |

**O R D E R**

A deputy sheriff seized five horses from a farm in Columbia County, Wisconsin, on suspicion of animal neglect. One of the horses, a 32-year-old mare named April, had been left in the care of the horse farm by its owner, Kelly Mahnke. The county eventually returned the mare, and Mahnke's objection to reimbursing the county's boarding expenses ultimately was resolved in her favor by a state appellate court, which held that the seizure was unlawful. Mahnke then sued the deputy sheriff in federal court, contending that the

---

[*]After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

seizure violated her constitutional rights. Without ruling on the propriety of the seizure, the district court granted the deputy summary judgment on the basis of qualified immunity. We affirm the judgment, but on the ground that the deputy's conduct was lawful.

The material facts are not in dispute. The Columbia County Sheriff's Department dispatched Detective Sergeant Daniel Garrigan to a local farm to investigate repeated complaints that several horses were being confined without proper care. When he arrived Garrigan saw five horses in a narrow enclosure, penned off from a larger group of horses in an adjacent pasture. The horses in the enclosure, Garrigan thought, appeared to be starving. They looked haggard and sluggish and disturbingly thin, and he could see in several of their frames the outlines of ribs and backbone. Open sores, seemingly untreated, were visible on the legs of two horses.

Compounding his concerns were the run-down conditions in the enclosure. The grass inside the fencing had been reduced to stubble, and although some feed had been stowed away nearby, it was inaccessible to the horses, and Garrigan could not locate an alternative source of food. Water, too, appeared limited. Garrigan saw only one viable source, a five-gallon rubber container filled three-quarters of the way with muddy water. A converted oil tank near the perimeter of the enclosure did hold a more plentiful supply, but a wire connected to an electric fence obstructed access to the tank, and Garrigan doubted that the horses had enough clearance to access the tank safely. He also observed that the horses had little in the way of shelter. It was a sweltering 4th of July, with midday temperatures exceeding 100 degrees, yet the horses' only reprieve from the sun was a small patch of shade at the far end of the enclosure.

Garrigan consulted several people with knowledge of horses before seizing the animals. Shirly Hoel and Kathy Schroeder, whose complaints had prompted Garrigan's visit, were waiting at the farm when he arrived and opined, based on their own experiences as horse owners, that the five in the enclosure were not being properly cared for. Garrigan spoke by phone with an equine veterinarian who, although unwilling to give an authoritative opinion without personally examining the horses, noted that on a hot day a five-gallon container of water would not suffice to support one horse, much less five. Garrigan then learned from a dispatcher that the president of the local humane society had been briefed on the details and agreed that protective custody was likely warranted.

Garrigan decided to take the horses into custody. Hoel volunteered to board them temporarily while the county sorted out matters with their owners. While the horses were being loaded, Duwayne Stork, the owner of the farm, arrived with a truckload of horse feed. When Garrigan explained that he was seizing the horses on suspicion of animal neglect, Stork insisted that Garrigan had it backwards—that the horses were confined *because* they

were in poor health, not the other way around. He explained that several of the horses
(Mahnke's included) were old and unable compete for grass in the main pasture, and that
several others had recently been recovered from the wild, where they had nearly starved,
and needed special care. As for the absence of food, he said he typically let them graze small
patches of pasture until they depleted the grass and had to be relocated. He admitted,
though, that the grass in this particular space had been exhausted. Stork added that,
because some of the older horses were hand-fed, their feed was stowed away, accessible
only to their caretakers. As for water, Stork insisted that the supply in the tank was ample,
and Jill Taylor, who boarded her horse on the farm, told Garrigan that she had fed and
watered the five horses that morning. Stork added that the two horses with sores on their
legs were receiving medical treatment. He said that a veterinarian would confirm his side of
the story and offered to bring one out at his own expense. Garrigan declined, and the horses
were taken away.

Mahnke was charged with neglecting her mare, a misdemeanor, *see* WIS. STAT. § 951.
The district attorney eventually dismissed the case, but that did not end the matter, because
when Mahnke filed a petition in state court for the return of April, *see* WIS. STAT. § 173.21(4),
the district attorney counterclaimed for the "costs of care," roughly $1,800. The county had
returned the horse by the time the suit proceeded to trial, so the only issue before the trial
court was the one presented by the counterclaim—whether Mahnke was liable for the costs
of care. Liability hinged on the propriety of the seizure: if Garrigan had "reasonable
grounds" (the equivalent of probable cause under the Fourth Amendment, *Johnson v. State*,
249 N.W.2d 593, 595-96 (Wis. 1977)) to believe that the five horses were being kept in
violation of state law, the seizure was proper and Mahnke liable for the costs; but if the
seizure was not supported by probable cause, the county would be on the hook for any
attendant expenses. The trial court decided that Garrigan had probable cause to seize the
horse and ordered Mahnke to pay the costs of care. A state appellate court reversed,
concluding that Garrigan was too hasty in blaming the farm owner for the condition of the
horses. *Mahnke v. Columbia County*, No. 2006AP1771, 2007 WL 1300731, at *4 (Wis. Ct. App.
May 3, 2007) (nonprecedential disposition). The Wisconsin Supreme Court denied the
county's petition for review.

One week before expiration of the six-year statute of limitations governing civil-
rights claims arising in Wisconsin, *see Hemberger v. Bitzer*, 574 N.W.2d 656, 657 (Wis. 1998),
Mahnke brought this suit in federal district court claiming that Garrigan had violated her
rights under the Fourth and Fourteenth Amendments when he took custody of April. For
relief, she seeks compensation for money spent, both in and out of court, trying to secure
April's return.

Following discovery, the district court granted summary judgment for Garrigan. Although Mahnke had never asserted that her victory in state court was preclusive on the question of probable cause, the district court assumed that it was and thus passed over the issue. Still, the district court concluded, Garrigan could not reasonably have known that he was violating the Fourth Amendment by seizing April and thus was shielded from liability by the defense of qualified immunity. And with respect to the Fourteenth Amendment claim, the court continued, Mahnke had no claim because Wisconsin provides an adequate postdeprivation remedy.

In this court the parties concentrate on the issue of qualified immunity, but the district court's analysis of that doctrine was unnecessary because Garrigan is not precluded from litigating the issue of probable cause. Wisconsin law controls whether the Wisconsin court's assessment of probable cause has preclusive effect in this case. *See* 28 U.S.C. § 1738; *Burke v. Johnston*, 452 F.3d 665, 669 (7th Cir. 2006). And where, as here, a party to prior litigation asserts issue preclusion against a nonparty, Wisconsin law requires that there exist privity or identity of interests between a litigant in the earlier suit and the party against whom preclusion is being asserted. *See Paige K.B. v. Steven G.B.*, 594 N.W.2d 370, 377 (Wis. 1999). This requirement is met when "a person is so identified in interest with a party to former litigation that he or she represents precisely the same legal right with respect to the subject matter involved." *Pasko v. City of Milwaukee*, 643 N.W.2d 72, 78 (Wis. 2002).

The district judge did not rely on any Wisconsin decision suggesting that courts in the state would conclude that Garrigan was in privity with the county during its fight over $1,800 in boarding expenses. Nor have we found any authority supporting that outcome. The county's objective in the earlier litigation was to recover its minimal expenditures flowing from the extended boarding of Mahnke's horse, not to vindicate Garrigan. He had no interest in that money and no hand in bringing the counterclaim. Garrigan did not litigate the state-court suit '"in the name of another to establish and protect his own right,'" nor did he assist the county's pursuit of its money "'in the aid of some interest of his own.'" *See Paige K.B.*, 594 N.W.2d at 378 (quoting *Montana v. United States*, 440 U.S. 147, 154 (1979)). He did testify as a witness for the county, but that did not place him in privity with the county. *Kruczek v. Wis. Dep't. of Workforce Dev.*, 692 N.W.2d 286, 296 (Wis. Ct. App. 2004).

It is true that the county fully litigated the question whether Garrigan had probable cause to believe that the horses were being mistreated, which is also the controlling issue in this civil-rights suit. But an identity of issues is not enough for earlier litigation to be preclusive. There is a distinction, as the Wisconsin courts recognize, between having one's issues litigated in an earlier proceeding and having one's *interests* litigated, *Pasko*, 643 N.W.2d at 78; *Kruczek*, 692 N.W.2d at 296, and it cannot be disputed that Garrigan's interests were unrepresented in the state-court proceeding. Courts faced with similar circumstances

have consistently refused to apply issue preclusion, *Jenkins v. City of New York*, 478 F.3d 76, 92 (2d Cir. 2007); *Bilida v. McCleod*, 211 F.3d 166, 170-71 (1st Cir. 2000); *McCoy v. Hernandez*, 203 F.3d 371, 375 (5th Cir. 2000); *Kraushaar v. Flanigan*, 45 F.3d 1040, 1050 (7th Cir. 1995), and the Supreme Court recently rejected this understanding of the doctrine as inconsistent with due process. *Taylor v. Sturgell*, 553 U.S. 880, 885 (2008).

We thus turn to the question of probable cause. Mahnke argues that a police officer in Garrigan's position could not have reasonably believed that there was probable cause to seize her horse. Mahnke insists that, because Garrigan knew little about these five horses and had been presented with a plausible explanation for their appearance, he lacked reasonable grounds to conclude that the horses were being neglected. At the very least, she argues, Garrigan was required to investigate further.

Probable cause exists if the information available would justify a reasonable belief that a crime has been committed. *Stokes v. Bd. of Educ.*, 599 F.3d 617, 622 (7th Cir. 2010); *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001). Before taking action, an officer is not required to engage in a technical legal inquiry to determine whether every element of a particular statute is satisfied. Rather, what matters is the reasonableness of the officer's exercise of judgment at the time it was made, without the benefit of hindsight and regardless whether the officer's belief turned out to be correct. *Siliven v. Indiana Dep't. of Child Servs.*, No. 10-2701, 2011 WL 891529, at *4 (7th Cir. Mar. 16, 2011) *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008).

Probable cause hinges on the elements of the relevant criminal statute. *Stokes*, 599 F.3d at 622. Under WIS. STAT. § 173.21, the police may seize an animal if reasonable grounds exist to believe it is being kept in violation of WIS. STAT. § 951. Section 951, among other things, prohibits treating animals in a cruel manner or depriving them of adequate food, water, or shelter from the sun. *Id*. §§ 951.02, 951.13, 951.14.

We conclude that Garrigan had probable cause to believe that the horses were being kept in violation of Wisconsin law. The determination of probable cause rests not only on the information Garrigan had received from third parties, on which he was entitled to rely, *see Sow v. Fortville Police Dep't.*, No. 10-2188, 2011 WL 477050, at *6 (7th Cir. 2011); *Pasiewicz v. Lake Cnty. Forest Pres. Dist.*, 270 F.3d 520, 524 (7th Cir. Feb. 11, 2001), but also on the appearance of the horses and his independent investigation of the enclosure, which only heightened his suspicion of neglect. This was not a weak inference to draw: the sight of five emaciated horses confined without ready access to food, water, and shade smacks of maltreatment, not least to an officer investigating complaints of animal neglect.

We recognize that Stork offered an explanation for the condition of the horses, but that explanation did not, as Mahnke asserts, negate probable cause for the seizure. Although a police officer cannot consciously disregard information that would bring clarity to a confusing situation, *Askew v. City of Chicago*, 440 F.3d 894, 895-96 , there is a meaningful distinction between *disregarding* potentially exculpatory information and *disbelieving* it. *Compare Kuehl v. Burtis*, 173 F.3d 646, 651 (8th Cir. 1999), *and BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986), *with Sow*, 2011 WL 477050, at *7, *and Forest v. Pawtucket Police Dep't.*, 377 F.3d 52, 57 (1st Cir. 2004). Here, it was with disbelief, not disregard, that Garrigan discounted Stork's explanation, acting instead on the equally plausible theory that the horses appeared malnourished because they were being confined without life's basic necessities. And disbelief was not an unreasonable reaction; Stork conceded that no grass remained for grazing in the area he had chosen to confine the emaciated horses, and his assertion that food was available but stored elsewhere did nothing to enlighten Garrigan about *why* the horses were emaciated. The officer had to account for Stork's explanation—and the record shows that he did—but he need not have credited it. *See Askew*, 440 F.3d at 895-96 (explaining that the constitution permits police "to initiate the criminal process and leave the sifting of competing claims and inferences to detectives, prosecutors, judges, and juries in the criminal prosecution."); *see also Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986).

Relatedly, Mahnke argues that Garrigan acted unreasonably by not extending the investigation after speaking with Stork. Specifically, she says that he should have waited for a veterinarian to examine the horses and provide an opinion as to the cause of their conditions. But an officer need not continue his investigation when sufficient information is available to support probable cause. *Stokes*, 599 F.3d at 624; *McBride v. Grice*, 576 F.3d 703, 707-08 (7th Cir. 2009). Having reasonably concluded that the horses were not being properly cared for, Garrigan had no duty under the Fourth Amendment to take further action.

Mahnke argues that a fact issue remains about whether Garrigan could have reasonably given weight to Shirley Hoel's opinion, since he knew Hoel had been insistent about rescuing the horses, even offering to board them herself. But while it is true that further investigation may be required where an officer knows that a complainant has improper motives, *Askew*, 440 F.3d at 895, the portions of the record Mahnke cites establish only that Hoel wanted the horses safe; there is no evidence that she wanted to keep the animals. In any event, this factual dispute would not alter the outcome of the suit, for the record supports a determination of probable cause with or without Hoel's complaint.

Finally, our conclusion that the seizure satisfied the requirements of the Fourth Amendment forecloses Mahnke's argument that she was deprived of procedural due process. The balance of individual and public interests embodied by the Fourth

Amendment "always has been thought to define the process that is due for seizures of person or property in criminal cases." *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 67 (1993); *Fuentes v. Shevin*, 407 U.S. 67, 93 n.30 (1972); *PPS, Inc. v. Faulkner Cnty.*, 630 F.3d 1098, 1107 (8th Cir. 2011); *Becker v. Kroll*, 494 F.3d 904, 920 (10th Cir. 2007); *Sanders v. City of San Diego*, 93 F.3d 1423, 1429 (9th Cir. 1996). A seizure arising from a criminal investigation does not threaten due process where, as here, the state requires a fair and reliable determination of probable cause as a condition to the seizure. *See Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 19 (1978); *Reams v. Irvin*, 561 F.3d 1258, 1264 (11th Cir. 2009).

AFFIRMED.